SUN CHEMICAL CORPORATION, Plaintiff,

v.

DAINIPPON INK & CHEMICALS, INC., Defendant.

No. 86 Civ. 3723 (PNL).

United States District Court, S.D. New York.

May 30, 1986.

As Amended June 3, 1986.

Cahill Gordon & Reindel, New York City (David R. Hyde, George Wailand, Laurence A. Silverman, of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Robert S. Rifkind, of counsel), for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

Sun Chemical Corp. seeks by this action and preliminary injunction motion to bar Dainippon Ink & Chemicals, Inc. from buying stock in Sun. Sun contends that by announcing an intention to purchase Sun stock Dainippon is committing a number of actionable wrongs under New York law including extortion, duress, coercion, interference with contract relations and prima facie tort. The motion was made by an order to show cause on May 12, 1986. Intensive discovery was conducted pursuant to a schedule set by the court with the consent of the parties, and the preliminary injunction hearing was conducted by submissions on May 22.

The background of the action is as follows:

Sun is a Delaware corporation. It was founded by its Chief Executive Officer Norman Alexander who until recently owned 33% of its stock. Recently, and apparently in response to Dainippon's interest, Mr. Alexander purchased additional stock bringing his holdings up to 44.6%.

The major volume of Sun's business and profits is constituted by its graphic arts materials and equipment divisions. Between them, they amounted to 72% of Sun Chemical's 1985 sales and 66% of its operating income (totaling $634.8 million in sales and $53.6 million in operating income).

Sun also is engaged in the manufacture of optical and electronic instruments through its Kollsman Instrument Division, which in 1985 contributed 18% of sales and 16% of operating income. The Kollsman business is divided between commercial and military instrumentation. During the past seven years, Sun has made a substantial investment (carried on its books at $102 million) in the stock of Chromalloy American Corp., amounting to 44% of Chromalloy's stock. This investment has resulted in significant charges against Sun's earnings. In 1985, Sun reported an $8 million charge against earnings resulting from the Chromalloy investment, including a charge of $0.6 million representing its pro rata share of Chromalloy's operating loss. Chromalloy is engaged in metal fabrication (in part for the Department of Defense), transportation, apparel, petroleum services and financial services. A part of Chromalloy's business consists of the ownership and operation of barges and other vessels carrying freight in U.S. coastwise trade.

Dainippon is a Japanese company engaged primarily in the manufacturing of printing materials and machinery. Dainippon reported revenues of $1.6 billion in 1985 and net profits of $19.6 million. Dainippon has a wholly owned U.S. subsidiary, DIC Americas, Inc. which imports inks and pigments; it reported revenues of $30 million in 1985.

For a number of years, Dainippon has had an interest in acquiring Sun's graphic arts materials business. Since 1978 it has had occasional discussions with Mr. Alexander concerning such an acquisition.

In June 1985 Dainippon entered into renewed discussions with Mr. Alexander about its possible acquisition of either the graphic arts materials business or the entire Sun company. Mr. Alexander spoke at the time of $600 million as a possible price for the graphic arts materials business. At the time the stock market value of Sun was

under $300 million. In September Dainippon engaged investment bankers Dillon, Read & Co. to evaluate different proposed transactions. Dillon Read estimated the graphic arts materials group at $300–400 million and Sun overall at $55–65 per share, or between $430 and 510 million. Sun retained Salomon Brothers. Its preliminary study of the graphic arts materials group brought an estimate of $358–457 million, based on projected earnings which later proved to have been overly optimistic. (This estimate, it should be noted, was never approved by the partners of Salomon Brothers.) The weakness of Sun's 1985 earnings led Alexander to discontinue talks for the time.

Beginning in late 1985, Dainippon acquired 388,900 shares of Sun Chemical on the open market. These purchases, at an average price of $34.92 per share, amounted to 4.9% of Sun's outstanding stock. In the spring of 1986, as the price of Sun's stock began to increase on the market, Dainippon reasserted its interest and sought to reopen discussions. On April 15, and on successive days, meetings were held between representatives of the two companies. Mr. Alexander met in New York with Dainippon's president Mr. Shigekuni Kawamura. Alexander spoke of a $600 million price for the graphic arts materials group. Dainippon offered $510 million for the combined graphic materials and graphic equipment (representing $425 million and $85 million). Alternatively, Dainippon offered $75 per share (or $585 million) to acquire Sun. Alexander rejected these offers.

Alexander then purchased a block of 11.4% of Sun's stock at $62/share.

Dainippon increased its offer on April 22 to $77 a share and on May 9 to $85 a share or $663 million. Sun in the meantime appointed an independent committee of directors to study the offer. The independent committee has made no report and the Board of Directors of Sun has made no response to the Dainippon proposals. Sun's investment bankers, Salomon Bros., have not delivered an opinion of valuation.

Mr. Alexander stated that the offer was personally unacceptable to him.

On May 12, 1986, Sun began this action.

### The Theory of Sun's Action

Certain aspects of Sun's business—the classified military contracting of Kollsman Instrument and Chromalloy and the coastwise marine transport business carried on by subsidiaries of Chromalloy—are subject to statutes and regulations requiring that they be conducted by United States citizens or entities. (Those activities of Sun and its subsidiaries are here referred to as the "Citizen Businesses.") Some of the relevant tests to determine U.S. citizenship are triggered by 5% and by 25% foreign stock ownership. Some turn on control. Sun postulates that if its shares were acquired by Dainippon, it would cease to be a U.S. entity according to the relevant statutes, with the alleged consequence that it would no longer be permitted to conduct its Citizen Businesses. It argues further that ship financing loans to Chromalloy guaranteed by the Maritime Administration would go automatically into default by virtue of Sun ceasing to be a U.S. entity, in turn triggering further default of all Chromalloy's loans.

The logic of Sun's complaint goes on to argue Dainippon cannot possibly have a good faith belief that it can acquire control of Sun in view of Alexander's holding of a 44% block (coupled with 4% holdings by other Sun officers). Dainippon's threatened purchases of Sun stock are therefore not intended to bring it control of Sun (which it cannot achieve), but are rather intended to threaten to wreak havoc by rendering illegal Sun's military and coastwise marine transport businesses; this threat Sun alleges is intended to coerce Sun into selling Dainippon the graphic materials business at an inadequate price. On this theory, Sun's complaint charges that Dainippon, by threatening to purchase Sun stock, commits extortion, coercion, interference with contract relations and prima facie tort.

## Discussion

Sun has failed to show entitlement to a preliminary injunction. Its legal theories and factual inferences are strained. Although the harms it postulates are considerable, the probability of the occurrence of such harms is very small. The familiar *Jackson Dairy* test awards a preliminary injunction to one who shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Sun has failed to satisfy either branch of the test.

### A. *Sun's Failure to Show Likelihood of Success, or Even Substantial Serious Questions as to the Merits*

Examining first the alternative branches of the test dealing with the merits of the claim, I am forced to conclude that Sun has failed to show even the existence of substantial serious questions for litigation, much less probability of success. Each of Sun's numerous causes of action requires as an element that the defendant have acted not for his own benefit but for the purpose of causing harm to the victim. As to this common element, Sun's proofs fail entirely.

Sun alleges that Dainippon's efforts to acquire Sun stock constitute extortion, coercion, duress, intentional interference with contractual relations and with prospective business advantage and prima facie tort. The proofs submitted fail to sustain or even to make out a colorable claim of any of these allegations. Passing the question whether extortion, coercion and duress constitute independent torts under New York law and assuming for argument that they do, each requires an element not present in this case. As defined in the Penal Code, extortionate conduct occurs when in order to induce the delivery of property, an action is taken "which would not in itself benefit the actor but which is calculated to harm another person materially...." *N.Y. Penal Code* § 155.05(2)(e)(ix) (McKinney 1975). Coercion, if it exists as a tort under New York law, requires as an element that the defendant have acted illegally. *Grandonico v. Consortium Communic. Int'l*, 566 F.Supp. 1288, 1293 (S.D.N.Y.1983) (Lasker, J.); *Ippisch v. Moricz-Smith*, 1 Misc.2d 120, 144 N.Y.S.2d 505 (Sup.Ct. Kings Cty.1955), *modified on other grounds*, 1 App.Div.2d 968, 150 N.Y.S.2d 419 (2d Dep't 1956). Harm suffered by a plaintiff that is merely incidental to defendant's lawful activity intended by the defendant for its own benefit does not support a cause of action.

Such a showing must also be made to sustain allegations of intentional interference with contract. *Alvord & Swift v. Muller Constr. Co.*, 46 N.Y.2d 276, 413 N.Y.S.2d 309, 385 N.E.2d 1238 (1978) ("interference must be intentional, not merely negligent or incidental to some other, lawful, purpose"). The New York Court of Appeals explained that plaintiff would have to show "that an intentional tort was committed in the sense of an intention to harm plaintiff without economic or other lawful excuse or justification." *Id.* at 282. And as to interference with prospective business advantage, plaintiff must prove "malicious, fraudulent, or deceitful actions" as opposed to "legitimate business motivation." *Optivision v. Syracuse Shopping Cntr. Assoc.*, 472 F.Supp. 665, 685 (N.D.N.Y.1979). Similarly, as to plaintiff's claim of prima facie tort, "it is well settled that a claim of prima facie tort does not lie where the defendant's action has any motive other than a desire to injure a plaintiff...." *Korry v. Int'l Tel. & Tel.*, 444 F.Supp. 193, 195 (S.D.N.Y.1978).

In its effort to satisfy these elements, Sun's complicated argument goes like this: Because Alexander personally holds 44% of Sun's stock and should be assumed to have the financial resources to acquire more, and because Alexander has indicated his opposition to Dainippon's proposals, Dainippon cannot expect to achieve *control* of

Sun. Because Dainippon cannot expect to achieve control of Sun, its motives in buying must be other than the acquisition of control; it must be motivated rather by the desire to threaten Sun with the injury to its Citizen Businesses that Sun argues would result from Dainippon's acquisition of Sun stock, and to use this threat as a bludgeon to force Sun to sell the graphic materials division at an unfairly low price.

Sun's evidence gives no support to this argument. To the contrary, the evidence is that Dainippon is contemplating purchase of Sun stock to acquire control of Sun as a means to obtain Sun's graphics materials business. The fact that Mr. Alexander has, up to now, not accepted Dainippon's offer does not require the conclusion that he will forever continue to do so. Nor is Dainippon required to assume that Mr. Alexander's personal resources are unlimited and that he will employ them to whatever extent is necessary to prevent Dainippon from buying control. Sun has not shown that Dainippon, in bidding for Sun, has any hidden agenda or ulterior motive. Sun has therefore failed to satisfy the common element discussed above of its various causes of action. It has failed to show evidence casting any serious question on the lawful motivation of Dainippon's bid. It has made no showing that Dainippon is acting so as to threaten injury to Sun, rather than in pursuance of an intention to acquire Sun.

Sun's argument furthermore attributes not only illogical but also self-destructive motives to Dainippon. Once Dainippon had invested hundreds of millions of dollars in Sun, any serious injury to Sun would result in pro rata injury to Dainippon. It is most unlikely that Dainippon would invest a considerable fortune in Sun's stock for the purpose of bringing ruin on Sun's businesses. It should be noted in this regard that Dainippon has received advice of counsel and of experts to the effect that the dire consequences predicted by Sun can be easily avoided. The likelihood that Sun may suffer these harms is discussed at greater length below in the section dealing with the question of irreparable harm and balance of hardships. As to the merits of Sun's

cause, the evidence tends to show that Dainippon does not believe its purchases will cause the forfeitures Sun claims will occur. This further detracts from Sun's argument that Dainippon's actions are motivated by the wish to threaten harm.

Finally, it is worth noting that Sun has failed to offer any proof supporting the proposition that the price Dainippon has offered is extortionately low. Dainippon is seeking to purchase Sun's graphic arts materials division either by purchase of the division or by purchase of Sun followed by divestiture of the unwanted assets. It has obtained financing commitments of over $600 million to enable it to do so. Prior to March 1986 when Dainippon's buying spurred a rise in Sun's stock, Sun had never sold at more than $40 (or an aggregate market value of $312 million). Dainippon's offer of $85 per share for all the stock of Sun (or $660 million), is more than twice the highest value Sun had ever reached until two months ago. Its offer of $425 million for the graphic arts materials division, which produces 63% of Sun's sales or 50% of its operating income, is in keeping with the valuations it has received from investment bankers.

Although Sun asserts that this bid is unfairly low, Sun has produced no evidence to support this contention. The preliminary studies of Sun's own investment bankers are in the range of Dainippon's offer. And although conclusory statements have been made to the effect that this informal valuation is too low, Sun's bankers have refrained from rendering a definitive opinion and have not substantiated the assertion of inadequacy.

In sum, Sun's argument is a fanciful construct, made to solicit court intervention in warding off a takeover attempt which management does not welcome. The inferences on which Sun's arguments rest are so strained and unlikely as to defy probability. I find that Sun's proof on these matters is so weak that it fails to raise a sufficiently serious question for litigation,

much less show likelihood of success on the merits.

### B. *Sun's Failure to Show Balance of Hardships in its Favor.*

Sun's claims of irreparable harm are unlikely and speculative at best—in any event, it appears, avoidable. The areas of alleged vulnerability by reason of citizen requirements are the classified military business of the Kollsman Instrument Division and Chromalloy and the coastwise maritime transport carried on by wholly owned subsidiaries of Chromalloy.

(a) *Military Business.* Sun contends that any increase in Dainippon's stock ownership above the 4.9% it now holds would cause the loss of Kollsman's classified military instrumentation business, as well as certain metal fabrication done for the military by Chromalloy. This contention concerns the effect of the Defense Department's Industrial Security Regulation, DoD 5220.22-R (December 1985) and Industrial Security Manual For Safeguarding Classified Information, DoD 5220.22-M (December 1985). Sun's contention is very much exaggerated.

In general, this regulatory scheme bars the necessary security clearance to a contractor which is under foreign ownership, control or influence ("FOCI"). The general policy stated in § 2–201 provides:

(a) A facility shall be considered under FOCI when a reasonable basis exists to conclude that the nature and extent of FOCI is such that foreign dominance over the managerial or operations of the facility may result in the compromise of classified information or impact adversely on the performance of classified contracts.

Sun argues that Dainippon's acquisition of 5% ownership would trigger adverse consequences under the regulation. It points to § 2–202(a) which identifies 5% foreign ownership as a factor to be "considered in determining whether a business ... is under FOCI." The 5% test is, however, merely a factor that triggers examination of the functional significance of whether "foreign interests control or influence or are in a position to control or influence the election, appointment, or tenure of directors, officers, or executive personnel...." § 2–202(d). Indeed the regulation specifies that foreign ownership becomes a concern when it is "at least sufficient to elect representation" to the board of directors. § 2–205. Short of that level, "[f]oreign ownership ... is not, in and of itself, considered significant...." *Id.*

Given the concentration of 44% of Sun's stock in Alexander's hands, plus another 4% in the hands of officers and directors, combined with Sun's provision for direct majority election of each director without cumulative voting, Dainippon's stock ownership would not give it any ability to influence or elect even a single place on the board until it acquired a near majority of the shares.

The regulation goes on to provide, furthermore, that even if it is "owned, controlled or influenced by foreign interests" (other than communist or hostile), a facility "may be eligible [for clearance], provided action can be taken to negate effectively or reduce associated FOCI risks to an acceptable level." § 2–201(c). The Department of Defense regulations contemplate continued security clearance for firms under foreign ownership and set forth procedures for retaining such clearance in § 2–205. When the quantity of stock ownership reaches the level which enables foreign interests to be represented on the board of directors, "[t]he effects of foreign ownership will ordinarily be mitigated by a resolution of the board of directors whereby the cleared firm recognizes the elements of FOCI and acknowledges its continuing obligations...." The board of directors are instructed to certify that representatives of foreign shareholders will be "effectively excluded from access to all classified information in the hands of the cleared facility" (such a board resolution being effective only if U.S. interests own a majority of the stock and remain in control of the firm and if the chairman and chief executive officer are U.S. citizens). § 2–205(a).

Where foreign stockholders own a majority of stock or otherwise control, the regulations state that a "voting trust agreement is an acceptable method to eliminate risks associated with foreign ownership...." "[A]ll prerogatives of ownership" must be vested with the trustees, except for the sale of substantial assets, mergers, dissolutions, and like transactions. The regulations mandate three trustees, at least one of whom "shall become a member of the board," and all shall be "completely disinterested" U.S. citizens and residents eligible for security clearance. § 2–205(b). Several other possible mitigating arrangements are discussed in the regulations, § 2–205(c)–(e).

It appears that Sun is wrong in its claim that stock acquisitions by Dainippon short of control would disqualify Sun from eligibility for further classified defense business. Indeed even if Dainippon acquired control, the regulations contemplate the possibility of insulating devices that might maintain Sun's eligibility.

As a practical matter, however, Dainippon cannot acquire control without the cooperation of Alexander, who is both Chief Executive Officer and 44% owner. And if Dainippon contracted to acquire control of Sun with Alexander's cooperation, there is no reason this could not be structured on a schedule that permitted divestiture or other insulation of the military businesses before Dainippon's control became effective. There are many ways this could be done. Dainippon furthermore has no desire to acquire the military business of Sun. Its plans as disclosed in its draft tender offer documents are to sell off these businesses as rapidly as possible. The accomplishment of divestiture prior to Dainippon's closing on its acquisition of the controlling shares would altogether avoid the problem.

Thus the injury Sun asserts it is likely to suffer regarding its military contracts is speculative, and avoidable. It does not constitute irreparable harm or show a balance of hardships in Sun's favor.

(b) *Maritime Business.* Sun further contends that the acquisition by Dainippon of more than 25% of Sun's stock would have disastrous consequences for Chromalloy's coastwise marine transport business. Citing various provisions of Title 46, Sun argues that Dainippon stock ownership in excess of 25% would render Chromalloy ineligible to engage in coastwise trade (§§ 802, 883), subject it to default on $65 million debt guaranteed by the Maritime Administration (§§ 1271 *et seq.*) and the seizure of its vessels by the United States. In addition, and as a consequence of the forfeiture, this would trigger the further default of its private debt of $135 million.

The Jones Act, 46 U.S.C. § 883, restricts the transportation of merchandise between points within the United States to vessels "owned by persons who are citizens of the United States...." The relevant requirements for citizenship are set out in § 802(a):

> [N]o corporation ... shall be deemed a citizen of the United States unless a controlling interest therein is owned by citizens of the United States, ..., but in the case of a corporation ... operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

This same requirement applies to eligibility for the federal ship loan guarantees held by subsidiaries of Chromalloy pursuant to 46 U.S.C. § 1274(a). Sun seizes on the 75% requirement and argues that "the acquisition by Dainippon and/or DIC of more than 25% of the stock of Sun Chemical Corporation would cause the vessels operated by Chromalloy's subsidiaries automatically to lose their coastwise rights" as well as "raise very serious issues" regarding forfeiture of the government guaranteed financings (Malia Aff. at 3).

In support, Sun submitted after the date of the hearing letters of the Coast Guard and the Maritime Administration (MARAD) of the Department of Transportation.[1] As to

---

**1.** Simultaneous with the filing of the opinion a    letter was delivered by the General Counsel of

the requirements of the Jones Act, the Coast Guard reads the citizenship provision "to mean that in a tiered ownership arrangement ... each entity in the arrangement must be coastwise qualified [75% U.S. stock ownership] in its own right." The MARAD submission is quite unclear and ambiguous on this question; it states that the owners *of the vessels* are subject to the 75% requirement. It states furthermore that acquisition by Dainippon of *control* of Sun "would pose serious consequences" which could not be overcome by trusts. MARAD's letters do not state, however, that a block of more than 25% but less than control of Sun in the hands of Dainippon would cause breach of the citizenship requirements for Chromalloy's shipowning subsidiaries.

Dainippon and its experts read the statutes differently. It argues that the 75% standard applies only "in the case of a corporation ... operating any vessel ...," *i.e.*, to those Chromalloy subsidiaries actually operating the vessels; as to Sun itself, Dainippon argues that the relevant statutory test is whether a "controlling interest" is owned by foreign citizens. So long as Dainippon's interest in Sun remains inferior to Alexander's—or as a practical matter unless Dainippon acquires a majority of Sun's stock—Dainippon claims that the citizenship requirements of coastwise trading and the federal loan guarantees are not implicated.

I note, without deciding the issue, that Dainippon's reading of the 75% provision is more consistent with the language of the statute. (I have less confidence in the validity of Dainippon's arguments as to the curative power of trusts, since the statute seems to disavow the use of trusts to undo

the consequences of foreign ownership.) But for present purposes it is unnecessary to decide these issues. In considering the balance of hardships, a district court must consider not merely the abstract potential for harm but the likelihood of its occurrence. A harm whose occurrence is a theoretical, but a most unlikely, possibility gives little support.

A practical assessment of the circumstances shows that Sun's claims of likelihood of harm are seriously exaggerated. First, it is not even argued that acquisition by Dainippon of less than 25% of Sun would have any effect on the maritime citizenship requirements. Second, as noted above, acquisition of control probably cannot be achieved without Alexander's assent; with Alexander's cooperation divestiture of the coastwise trading assets (or other suitable transaction) can be accomplished in consultation with MARAD and the Coast Guard in such a way as to assure there will be no forfeiture.

The only danger zone would be an acquisition of more than 25% but less than control. As to such an investment, it is most unlikely that Dainippon would invest a fortune if the consequence of the investment were to destroy its value. Sheer self-interest should be sufficient to prevent Dainippon from purchasing more than 25% but less than 50% of Sun without having received satisfactory assurances from the Department of Transportation that the investment will not cause catastrophic forfeitures to Chromalloy.

In short, Sun's claims of irreparable harm are exaggerated, speculative and unlikely. In contrast, the harm Sun would impose on Dainippon through the injunction would be an absolute bar from pursuing a

the United States Department of Transportation which supervises the Maritime Administration and the Coast Guard, in effect withdrawing their letters. As to the issue whether the 75% test is applicable to a parent company as well as to a ship operating company, the General Counsel's office says the issue is currently under review. The letter also asserts that the Department of Transportation has made no ruling governing the curative effects of trusts. Finally, it states that the Department "has not been

presented with enough information concerning the details of the transactions in question here to provide a ruling."

Because all these letters were submitted subsequent to the close of the preliminary injunctive hearing, and because their status and expression of views is in doubt, it seems best that they be disregarded altogether and not be considered as part of the record. [Footnote added June 2, 1986.]

lawful business objective. The balance of hardships tips in Dainippon's favor. Sun's proofs and theories are weak. They do not satisfy the requirements for a preliminary injunction.

*Conclusion*

Sun's application for a preliminary injunction is denied.

SO ORDERED.