970 F.2d 1206
 1992 A.M.C. 2816
 CONOCO, INC.; E.I. Du Pont De Nemours and Co., Petitioners
in No. 91-3589,
v.
Samuel K. SKINNER, Secretary of Transportation; Warren G.
Leback, Maritime Administrator; and the United
States of America.
CONOCO, INC.; E.I. Du Pont De Nemours and Co., Appellants
in No. 91-3920,
v.
Samuel K. SKINNER, Secretary of Transportation; Nicholas F.
Brady; William A. Kime, Commandant of the Coast Guard;
Warren G. Leback, Administrator, U.S. Department of
Transportation; Carol B. Hallett, Commissioner of Customs,
U.S. Customs Service.
 Nos. 91-3589, 91-3920.
 United States Court of Appeals,
Third Circuit.
 Argued May 19, 1992.
Decided July 16, 1992.
Rehearing and Rehearing In Banc Denied Aug. 18, 1992.
 
 Mark P. Schlefer (argued), T.S.L. Perlman, Leonard Egan, William C. Buckhold, Fort & Schlefer, Washington, D.C., for petitioners-appellants.
 Stuart M. Gerson, Asst. Atty. Gen., William C. Carpenter, Jr., U.S. Atty., Robert V. Zener, Jeffrey Clair (argued), Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for respondents-appellees.
 Before: HUTCHINSON, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ROBERT E. COWEN, Circuit Judge.
 
 
 1
 This consolidated case involves the complex statutory scheme regulating the ownership, operation, and chartering of vessels in the coastwise trade. Petitioners-appellants Conoco and Du Pont challenged regulations of the Coast Guard and the Maritime Administration which required that parent corporations of subsidiaries operating vessels in the coastwise trade be 75 percent owned by U.S. citizens. The district court dismissed their claims for lack of jurisdiction. Conoco and Du Pont also filed a protective petition in this court asking us to review the Maritime Administration regulation. We hold that we have exclusive jurisdiction to hear this case, and thus affirm the district court's dismissal. On the merits, we uphold the regulation as promulgated by the Maritime Administration.
 
 I.
 A.
 
 2
 The ownership, operation, and chartering of vessels in the coastwise trade[1] is regulated by several statutory provisions. Section 2 of the Shipping Act of 1916, ch. 451, 39 Stat. 729, provides:
 
 
 3
 Within the meaning of this chapter no corporation, partnership, or association shall be deemed to be a citizen of the United States unless the controlling interest therein is owned by citizens of the United States ... but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.
 
 
 4
 46 U.S.C.App. § 802(a) (1988) (emphasis added). Thus, there are two citizenship requirements in section 2. Generally, U.S. citizens must hold a "controlling interest" in a corporation for the corporation itself to be considered a U.S. citizen. Section 2 describes "controlling interest" in terms of majority stock control and majority voting power. 46 U.S.C.App. § 802(b) (1988). However, there is an exception for corporations operating vessels in the coastwise trade; these corporations must be 75 percent owned by U.S. citizens. Whether this 75 percent requirement applies to parent corporations of subsidiaries operating coastwise vessels is the dispute in this case.
 
 
 5
 The citizenship requirement of section 2 is incorporated into section 9 of the Shipping Act, as amended, which provides:
 
 
 6
 [A] person may not, without the approval of the Secretary of Transportation--
 
 
 7
 (1) sell, mortgage, lease, charter, deliver, or in any manner transfer ... to a person not a citizen of the United States, any interest or control of a documented vessel ... owned by a citizen of the United States or the last documentation of which was under the laws of the United States ...
 
 
 8
 46 U.S.C.A.App. § 808(c) (West Supp.1992). Thus, it is a violation of section 9 to transfer a vessel owned by a U.S. citizen to a non-U.S. citizen without the Secretary's approval. See 46 U.S.C.App. § 839 (1988) ("such approval may be accorded either absolutely or upon such conditions as the Secretary of Transportation prescribes"). Section 2's citizenship requirement is also incorporated into section 27 of the Merchant Marine Act of 1920, ch. 250, 41 Stat. 999, commonly referred to as the Jones Act, which specifies that no merchandise shall be transported by water between points in the U.S. except in a vessel "owned by persons who are citizens of the United States." 46 U.S.C.App. § 883 (1988).
 
 
 9
 The so-called Bowaters Amendment of 1958, Pub.L. No. 85-902, 72 Stat. 1736, created a narrow exception for certain corporations which could not otherwise meet the stringent 75 percent citizenship requirement of section 2. 46 U.S.C.App. § 883-1 (1988). The amendment derives its name from the Bowaters Southern Paper Corporation, which was owned by Canadian and British interests and could not qualify as a U.S. citizen under section 2. See S.Rep. No. 2145, 85th Cong., 2d Sess. 2-3 (1958), 1958 U.S.Code Cong. & Admin.News 5190. Although Bowaters was headquartered in Tennessee, and managed and staffed almost exclusively by Americans, it could not own and operate barges in order to bring in pulpwood or send out newsprint to its U.S. customers. Consequently, an amendment to the existing laws was proposed to provide limited relief to corporations such as Bowaters and the Shell Oil Co., which was partially owned by Dutch and British companies.
 
 
 10
 The Bowaters Amendment allows certain corporations to document[2] vessels for coastwise trade, provided that the vessels are only used to carry "proprietary" cargo owned by either the corporation or its affiliates. To qualify as a "Bowaters corporation," a corporation must be incorporated under U.S. laws and satisfy five requirements: a majority of its officers and directors must be U.S. citizens; at least 90 percent of its employees must be U.S. residents; it must be engaged primarily in a manufacturing or mineral industry in the U.S.; the aggregate book value of the corporation's vessels cannot exceed ten percent of the aggregate book value of the corporation's assets; and it must purchase or produce in the U.S. at least 75 percent of the raw materials used or sold in its operations. 46 U.S.C.App. § 883-1.
 
 
 11
 The Bowaters Amendment also places several restrictions on Bowaters corporations. These corporations cannot operate vessels which they own as common carriers for the carriage of non-proprietary cargo. The amendment thus provides that no vessel owned by a Bowaters corporation "shall engage in the fisheries or in the transportation of merchandise or passengers for hire between points in the United States ... except as a service for a parent or subsidiary corporation." Id. Bowaters corporations are also restricted in their ability to charter out vessels to other parties. Id.
 
 B.
 
 12
 In 1981, E.I. Du Pont Nemours and Co. ("Du Pont"), an American chemical corporation, battled Joseph E. Seagram & Sons, Inc., a Canadian corporation, for control of Conoco, Inc. See Joseph E. Seagram & Sons, Inc. v. Conoco, Inc., 519 F.Supp. 506 (D.Del.1981). Conoco, which was founded in 1876, is an oil company engaged in the production, transportation, refining, and marketing of petroleum and petroleum products. Du Pont ultimately prevailed and now holds all of the capital stock of Conoco through Du Pont Energy Company. Seagram exchanged its Conoco stock for Du Pont stock, and was given limited representation on Du Pont's board of directors. Seagram also agreed to vote for directors nominated by Du Pont and not to acquire more than 25 percent of the voting stock of Du Pont.
 
 
 13
 In 1984, JES Developments, Inc., an indirect, wholly-owned subsidiary of Seagram, controlled 24.5 percent of Du Pont stock. Another 0.59 percent of Du Pont's stock was held by stockholders with registered addresses outside the U.S. Since it was likely that many of these stockholders, as well as others with U.S. addresses, were non-citizens, Du Pont informed the Department of Transportation that it could no longer certify that it was 75 percent owned by U.S. citizens. Faced with section 2's citizenship requirement which it appeared no longer to satisfy, Du Pont argued that U.S. citizens continued to hold a "controlling interest" (i.e., more than 50 percent stake) in Du Pont, and thus, its wholly-owned subsidiary, Conoco, continued to be owned by an U.S. citizen under section 2. In short, Du Pont argued that Conoco could own and operate vessels in the coastwise trade, even though Du Pont could not.
 
 
 14
 Both Du Pont and Conoco have substantial economic interests at stake, since the operation of vessels in the coastwise trade is important to both of their businesses. Du Pont owns 32 bulk liquid chemical barges, and "bareboat" charters[3] 12 barges. Conoco owns 10 pushboats (towboats) and 17 bulk liquid petroleum barges, and bareboat charters one pushboat and nine barges.
 
 
 15
 Du Pont uses its barges to transport its chemical products between Du Pont facilities and occasionally to its customers. A barge which transports chemical products must be cleaned before a different product can be transported in the barge. The cleaning process is expensive and releases pollutants which must be disposed of or stored. Due to the large volume of chemical products which are shipped by Du Pont, the company is able to "dedicate" almost all of its barges to the carriage of a single chemical product, thus avoiding the necessity of cleaning the barges between trips. If Du Pont were forced to seek greater service from independent barge operators with "non-dedicated" barges, Du Pont alleges that its costs would increase substantially.
 
 
 16
 In 1990, Conoco used its coastwise vessels to carry 27 million barrels of crude and refined petroleum products, including approximately 10 million barrels for others for compensation. If Conoco were required to dispose of all of its vessels and rely completely on independent marine operators for transportation, it contends that it would lose more than $12 million each year, in part because some of the shallow waters of southern Louisiana near Conoco's Lake Charles refinery are not serviced by independent operators. If Conoco were only required to stop carrying products for other companies, thus leaving its vessels underutilized, it claims that it would lose $5 million each year.
 
 
 17
 Du Pont and Conoco requested that the Department of Transportation agree to their interpretation of section 2. The Department is responsible for the administration of the statutes concerning the documentation and transfer of vessels. The administration of the documentation requirements has been delegated to the Coast Guard, 46 U.S.C. § 2104 (1988); 49 C.F.R. §§ 1.4(b), 1.46(d), and the administration of the transfer requirements to the Maritime Administration ("Marad"). 46 U.S.C.App. § 876 (1988 & Supp.1990); 49 C.F.R. §§ 1.4(j), 1.66(a)(b) & (t) (1991). The Department took Conoco's request under advisement.
 
 
 18
 In February 1989, Marad promulgated an "interim final rule" which stated that "the interest owned by citizens of the United States shall be not less than 75 percent in the event of direct or indirect ownership of a vessel engaging in the coastwise trade." 54 Fed.Reg. 5387 (1989) (to be codified at 49 C.F.R. § 221.3(k)(2)). In October 1989, the Coast Guard proposed to revise its vessel documentation regulations to require that a stockholder of a vessel-owning corporation be a citizen eligible to document vessels in its own right. 54 Fed.Reg. 41,992 (to be codified at 46 C.F.R. § 67.03-2(b)). "In keeping with longstanding Coast Guard practice, the American control provisions are interpreted to require American control among all the entities which have an ownership interest in a vessel owning entity." 54 Fed.Reg. 41,996 (emphasis added). In May 1990, Du Pont filed a comment on the proposed Coast Guard regulation, stating its contrary interpretation of section 2.
 
 
 19
 In December 1990, a final Coast Guard regulation was promulgated with language essentially identical to the proposed regulation. This final regulation stated:
 
 
 20
 For purposes of meeting the stock or equity interest requirements for citizenship under this subpart where title to a vessel is held by an entity comprised, in whole or in part, of other entities which are not individuals, each entity contributing to the stock or equity interest qualifications of the entity holding title must be a citizen eligible to document vessels in its own right with the trade endorsement sought.
 
 
 21
 55 Fed.Reg. 51,251 (1990) (to be codified at 46 C.F.R. § 67.03-2(b)) (emphasis added). Under this regulation, the 75 percent citizenship requirement of section 2 applied to each corporation in the ownership chain.
 
 
 22
 In March 1991, Du Pont and Conoco filed a complaint in the district court challenging both the Marad "interim final rule" and the Coast Guard final regulation as being contrary to the language of section 2. Named as defendants were the Secretary of Transportation, the Secretary of Treasury, the Commandant of the Coast Guard, the Administrator of Marad, and the Commissioner of the U.S. Customs Service.[4] Du Pont sought a declaratory judgment that it was a citizen under section 2 and thus, its subsidiary, Conoco, was allowed to own and operate vessels in the coastwise trade. In the alternative, both Du Pont and Conoco asserted that as "Bowaters corporations," they should be deemed "constructive" U.S. citizens for the purpose of bareboat chartering U.S.-documented vessels from corporations that qualified as U.S. citizens. Although both Conoco and Du Pont qualified as Bowaters corporations[5] and were allowed to own vessels for the transportation of proprietary cargo, they argued to the district court that both corporations should be allowed to bareboat charter vessels from other corporations for the transportation of non-proprietary cargo for hire as long as other corporations held nominal title to the vessels.
 
 
 23
 In July 1991, after commencement of the district court action, Marad promulgated a second "interim final rule" interpreting sections 2 and 9, and the Bowaters Amendment.[6] This rule applied the 75 percent citizenship requirement to "any Controlling Interest stockholder, any Person whose stock is being relied upon to establish the requisite U.S. citizen ownership and any parent corporation ... at all tiers of ownership." 56 Fed.Reg. 30,665 (1991) (to be codified at 46 C.F.R. § 221.3(c)) (emphasis added). Thus, both parent and subsidiary corporations are required to be 75 percent owned by U.S. citizens. In reaching the conclusion that this requirement applied at each tier of ownership, this second Marad rule explicitly relied on the December 1990 Coast Guard regulation: "MARAD's language, while not identical, is entirely consistent with that adopted by the Coast Guard and reflects MARAD's administrative policy in this area." Id. at 30,655.
 
 
 24
 The second Marad rule also defined a Bowaters corporation as "a Noncitizen corporation." Id. at 30,665 (1991) (to be codified at 46 C.F.R. § 221.3(a)). Under the Marad rule, regulatory approval is not granted for bareboat charters to Bowaters corporations for operation in the coastwise trade. Id. at 30,667-68 (to be codified at 46 C.F.R. § 221.13(a) & (b)). Time charters are approved as long as the vessel would not be engaged in for-hire transportation except as a service for a parent or subsidiary corporation. Id. at 30,668 (to be codified at 46 C.F.R. § 221.13(b)(2)). The Marad rule appeared to codify what had been an unstated policy of the agency:
 
 
 25
 [T]ime charters and other arrangements in [sic] the Bowaters corporations require (and routinely receive) MARAD approval. Because of MARAD's longstanding policy against approval of bareboat or demise charters to non section 2 citizens of vessels operating in the coastwise trades, Bowaters companies have not received approval for such charters.
 
 
 26
 Id. at 30,659. In September 1991, Du Pont filed a comment on this second Marad rule.
 
 
 27
 In the district court proceedings, the defendants-appellees moved to dismiss the complaint on the ground that the court of appeals has exclusive jurisdiction to review any regulation issued by an agency within the Department of Transportation. Conoco[7] then filed a protective petition in this court asking us to review, set aside, and suspend the July 1991 Marad rule. In December 1991, the district court dismissed Conoco's claims for lack of jurisdiction. Conoco v. Skinner, 781 F.Supp. 298 (D.Del.1991). Conoco appeals the dismissal to this court. The appeal and petition for review were consolidated.
 
 II.
 
 28
 At the outset, we note that our discussion of jurisdiction does not affect our ability to hear the merits of this case, since Conoco timely filed a protective petition in this court for review of the July 1991 Marad rule. For reasons unknown to us, Conoco did not file a protective petition seeking review of the merits of the Coast Guard regulation.[8] Although only the substantive validity of the Marad rule is before us, we must still consider our jurisdiction over both the Coast Guard and Marad regulations. We hold that the district court's dismissal for lack of jurisdiction was proper, because this case should have been brought originally in the court of appeals.
 
 
 29
 The Administrative Orders Review Act, 28 U.S.C. §§ 2341-51 (1988), which is commonly referred to as the Hobbs Act, vests this court with exclusive jurisdiction over many types of agency regulations. The act states in pertinent part:
 
 
 30
 The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--
 
 
 31
 . . . . .
 
 
 32
 (3) all rules, regulations, or final orders of--
 
 
 33
 (A) the Secretary of Transportation issued pursuant to section 2, 9, 37, 41, or 43 of the Shipping Act, 1916 ...
 
 
 34
 (B) the Federal Maritime Commission issued pursuant to--
 
 
 35
 (i) section 23, 25, or 43 of the Shipping Act, 1916
 
 
 36
 . . . . .(ii) section 19 of the Merchant Marine Act, 1920
 
 
 37
 . . . . .
 
 
 38
 28 U.S.C. § 2342 (1988). Conoco argues that the district court had original jurisdiction for two reasons: 1) the Coast Guard is not included within the Hobbs Act and; 2) only Marad's orders, not its rules and regulations, are covered by the Hobbs Act.[9] Both of these arguments are without merit.
 
 
 39
 The Hobbs Act should be liberally construed to allow exclusive jurisdiction in the court of appeals. In Florida Power & Light Co. v. Lorion, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), the Supreme Court held that the court of appeals had initial subject-matter jurisdiction over a Nuclear Regulatory Commission order which denied citizen petitions requesting a Commission proceeding. The Court noted that the courts of appeals presumptively have jurisdiction over administrative decisions in order "to avoid the duplication of effort involved in creation of a separate record before the agency and before the district court." Id. at 740, 105 S.Ct. at 1605. "Absent a firm indication that Congress intended to locate initial [Administrative Procedure Act] review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." Id. at 745, 105 S.Ct. at 1607.
 
 
 40
 Although no administrative hearing occurred in Florida Power which would have provided the court of appeals with a factual basis to evaluate the agency's action, the Court stated that "[t]he factfinding capacity of the district court is ... typically unnecessary to judicial review of agency decisionmaking." Id. at 744, 105 S.Ct. at 1607. In the case before us, district court review is particularly unnecessary, since the parties do not disagree about the facts, but only about whether Conoco and Du Pont qualify as U.S. citizens given these facts. Therefore, the district court was correct in noting that the lack of an administrative record in this case does not affect our exclusive jurisdiction. See Conoco, 781 F.Supp. at 314.
 
 
 41
 We have previously espoused a liberal construction of our jurisdiction over agency actions "absent clear and convincing evidence of a contrary congressional intent." Modine Mfg. Corp. v. Kay, 791 F.2d 267, 270 (3d Cir.1986) (construing Clean Water Act). "To avoid unintended and anomalous results, statutes authorizing review of specified agency actions should be construed to allow review of agency actions which are 'functionally similar' or 'tantamount to' those specified actions." Vineland Chemical Co., Inc. v. EPA, 810 F.2d 402, 405 (3d Cir.1987) (construing Resource Conservation and Recovery Act). In the case currently before us, both the Coast Guard and Marad regulations interpret section 2 of the Shipping Act, making these regulations "functionally similar" or "tantamount to" a Department of Transportation regulation interpreting section 2. We discern no contrary congressional intent which would indicate that our jurisdiction should be limited in this area.[10]
 
 
 42
 With respect to the Coast Guard regulation, Conoco argues that the Coast Guard is not defined as an "agency" in the Hobbs Act, see 28 U.S.C. § 2341(3) (1988), and thus its regulations are not reviewable in the first instance by the court of appeals. Although it is true that the Coast Guard is not expressly included as an "agency,"[11] we note that the conferral of exclusive jurisdiction in 28 U.S.C. § 2342 does not even use the term "agency." The provision simply allows jurisdiction over "all rules, regulations, or final orders" of the Secretary of Transportation with respect to the Shipping Act. The omission of the Coast Guard from the definition of "agency" is at most technical, since the Coast Guard is considered an agency for other purposes, including the Administrative Procedure Act. See 5 U.S.C. § 552(f) (1988) (APA definition of agency); 33 C.F.R. § 1.05-5 (1991) (Coast Guard rulemaking under APA). Therefore, the Coast Guard's status as an agency within the meaning of the Hobbs Act is of no moment.
 
 
 43
 Rather, the key jurisdictional issue is whether the Coast Guard's regulation can be fairly attributed to the Secretary of Transportation, whose rules and regulations are clearly included within the Act. Conoco provides no evidence that the Coast Guard was acting independently from the Secretary when the Coast Guard promulgated its December 1990 regulation. Indeed, we conclude, as did the district court, that the Coast Guard promulgated its regulation on behalf of and with full approval of the Secretary of Transportation. See Conoco, 781 F.Supp. at 310 n. 16.
 
 
 44
 In the alternative, Conoco contends that the Coast Guard regulation was issued "pursuant to" the vessel documentation laws, 46 U.S.C.A. §§ 12101-22 (West Supp.1992), rather than the Shipping Act of 1916, and thus the regulation does not fall under the Hobbs Act. Conoco asserts that "pursuant to" implies that there must be a direct delegation of authority from the Department of Transportation to the Coast Guard, yet only responsibility for the vessel documentation laws, not the Shipping Act, has been delegated to the Coast Guard. 49 C.F.R. § 1.46(d); see also 49 C.F.R. § 1.66(a) & (b) (delegating responsibility for Shipping Act to Marad). This reading of "pursuant to" is far too narrow.
 
 
 45
 The Supreme Court has defined "pursuant to" as " 'acting or done in consequence or in prosecution (of anything); hence, agreeable; conformable; following; according.' " Old Colony Trust Co. v. Commissioner of Internal Revenue, 301 U.S. 379, 383, 57 S.Ct. 813, 815-16, 81 L.Ed. 1169 (1937) (quoting Webster's New Int'l Dictionary, Unabridged (2d ed. 1935)). Not only is the Coast Guard's regulation concerning vessel documentation "agreeable" and "conformable" to the goals of section 2, but it also makes frequent references to section 2. See 55 C.F.R. 51,245-47 (1990). Even if we adopted a narrow view of "pursuant to," we could find exclusive jurisdiction on the ground that the vessel documentation laws and section 2 are interrelated. The vessel documentation laws require compliance with the coastwise trade laws, 46 U.S.C. § 12106(a)(3), which in turn require compliance with section 2's citizenship requirement. 46 U.S.C.App. § 883. We thus hold that this court has exclusive jurisdiction to review the Coast Guard regulation.
 
 
 46
 Conoco next contests our jurisdiction over Marad's rules and regulations. As originally enacted in 1950, the Hobbs Act only allowed review of "final orders" of Marad and the unrelated Federal Maritime Commission ("FMC"). See Pub.L. No. 81-901, ch. 1189, § 2, reprinted in 1950 U.S.C.C.S. 1229. When the Act was amended in 1986, jurisdiction was conferred over "all rules, regulations, or final orders." 28 U.S.C. § 2342(3). Despite this seemingly unambiguous language, Conoco contends that the 1986 Hobbs Act amendment was only intended to extend jurisdiction over the rules and regulations of the FMC, not Marad, and therefore the Marad "interim final rule " currently before us should have been heard initially by the district court. We disagree.
 
 
 47
 Conoco's discussion of the state of the law prior to 1986 and the legislative history of the 1986 amendment is rather academic, since the plain language of the current Hobbs Act clearly allows review of Department of Transportation rules and regulations "issued pursuant to" sections 2 and 9 of the Shipping Act. The Marad rule is obviously an interpretation of sections 2 and 9, see 56 Fed.Reg. 30,654-57 (1991), and was promulgated under an express delegation of authority from the Secretary of Transportation, thus making it a rule "of" the Secretary.[12] See 49 U.S.C. § 109(b) (1988); 49 C.F.R. §§ 1.66(a) & (t) (1991). We need not delve into this issue any further, because "[a]bsent a clearly expressed legislative intention to the contrary, [the statute's] language must ordinarily be regarded as conclusive." Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). We agree with the district court's detailed analysis of this issue, see Conoco, 781 F.Supp. at 309-13, and its conclusion that the court of appeals has exclusive jurisdiction over the Marad rule.[13]
 
 
 48
 In conclusion, we hold that the district court correctly dismissed the complaint for lack of jurisdiction.
 
 III.
 
 49
 On the merits, there are two separate but interrelated issues: 1) whether the parent of a subsidiary which owns a coastwise vessel must itself satisfy the 75 percent citizenship requirements of section 2; and 2) whether a Bowaters corporation has unfettered authority to bareboat charter vessels from other corporations for the transportation of non-proprietary cargo as a common carrier.
 
 A.
 
 50
 In determining whether the Marad regulation is valid, we look first at the language of section 2 and the plain meaning of that language. See Immigration and Naturalization Serv. v. Elias-Zacarias, --- U.S. ----, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) ("In construing statutes, 'we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.' ") (citation omitted). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). If the statute is unambiguous, our inquiry is over, since courts and agencies must follow the "clearly expressed intent of Congress." Board of Governors, FRS v. Dimension Fin. Corp., 474 U.S. 361, 368, 106 S.Ct. 681, 685-86, 88 L.Ed.2d 691 (1986).
 
 
 51
 If, on the other hand, the statute is silent or ambiguous with respect to the specific question addressed by the regulation, we examine the agency interpretation under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A reviewing court must look at whether the agency's construction of the statute is "permissible." Id. at 843, 104 S.Ct. at 2782; see also K Mart, 486 U.S. at 292, 108 S.Ct. at 1818 (agency interpretation cannot conflict with plain language of statute); Air Courier Conference of America/Int'l Comm. v. United States Postal Serv., 959 F.2d 1213, 1224 (3d Cir.1992) (agency's interpretation must be reasonable). Under this highly deferential standard, a court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Lastly, a court must determine whether the agency's current interpretation is consistent with the agency's previous interpretations. Id. at 863-64, 104 S.Ct. at 2792; see also Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) ("[T]he weight of an administrative interpretation will depend ... upon 'its consistency with earlier and later pronouncements' of an agency.") (citation omitted).
 
 
 52
 We must first determine whether the language of section 2 on its face applies the 75 percent citizenship requirement to parent corporations. The government argues that the plain meaning of section 2 is ambiguous, and thus, we should defer to Marad's interpretation. Conoco responds that section 2 is not ambiguous, and thus, no deference is required. We find that the wording of section 2 is incomplete since it merely states that "in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum." 46 U.S.C.App. § 802(a). Section 2 does not address whether the parent of the subsidiary must also meet this citizenship requirement.
 
 
 53
 Because the statute speaks in terms of the citizenship of the "corporation, association, or partnership operating any vessel in the coastwise trade," Conoco argues that the 75 percent requirement only applies to the corporation which actually "operates" the vessels (in this case, Conoco), while the 50 percent "controlling interest" requirement applies to the parent corporation (Du Pont) and other corporate stockholders. According to Conoco, the parent Du Pont cannot be said to be "operating" any vessels, since Conoco owns, repairs, books, insures, and mans the vessels. Thus, Conoco asserts that it is 100 percent owned by a "citizen of the United States," since it is the wholly-owned subsidiary of a corporation which is majority-controlled by a U.S. citizen. We believe this analysis is faulty since it reads too much into the term "operating."
 
 
 54
 Black's Law Dictionary defines "operate" as: "To perform a function, or operation, or produce an effect." Black's Law Dictionary 1091 (6th ed. 1990). More significant is that "operation" is defined as "[e]xertion of power." Id. at 1092. Obviously, the corporate parent of a vessel-owning subsidiary both "perform[s] a function" and "exert[s] power" vis-a-vis the vessels since the parent has ultimate control over the subsidiary and its actions. Since corporations are mere legal fiction, the notion of a corporation physically operating a vessel is a bit absurd. Thus, in the context of section 2, we analyze the word "operating" in terms of corporate stock control rather than actual control over the vessel.
 
 
 55
 Conoco contends that it and Du Pont are two independent entities. The corporations have separate headquarters: Conoco in Houston and Du Pont in Wilmington, Delaware. None of the 92 employees in Conoco's domestic marine operations is also an officer or employee of Du Pont. Neither corporation carries cargo for the other. However, the ostensibly separate operations of the two corporations do not negate the fact that Du Pont owns all of Conoco's stock and thus, necessarily owns Conoco's vessels. See H.Rep. No. 100-918, 100th Cong., 2d Sess. 24, reprinted in 1988 U.S.C.C.A.N. 6104, 6117 (a transfer of control of a subsidiary also transfers all vessels owned or operated by that subsidiary). Equally significant is the fact that the chairman and chief executive officer of Du Pont, E.S. Woolard, Jr., is also the chairman of Conoco. The executive vice president of Du Pont, C.S. Nicandros, is the president and chief executive officer of Conoco. Generally, in examining parent-subsidiary relationships, "[i]t is assumed to be the norm that a parent will have 'not only ... the potential to exercise control [over the subsidiary] but to exercise it to a substantial degree.' " Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir.1988) (citation omitted). Thus, in scrutinizing the Conoco-Du Pont relationship, we will not shield our eyes from the realities of corporate ownership by adopting a narrow interpretation of the term "operating."
 
 
 56
 A broad reading of "operating" is supported by another provision in section 2, which states that a corporation will not be deemed to be a U.S. citizen
 
 
 57
 (c) if, through any contract or understanding, it is so arranged that more than 25 per centum of the voting power in such corporation may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or
 
 
 58
 (d) if by any other means whatsoever control of any interest in the corporation in excess of 25 per centum is conferred upon or permitted to be exercised by any person who is not a citizen of the United States.
 
 
 59
 46 U.S.C.App. § 802(c) (emphasis added). The highlighted phrases indicate Congress' intention that the requirements of section 2 extend beyond the subsidiary which legally owns and operates the vessels. These phrases invite, and indeed require, courts to look for any possible way in which non-citizens could exercise more than 25 percent of a vessel-owning corporation's voting power.
 
 
 60
 The far-reaching nature of section 2's citizenship requirements was examined by the Supreme Court in Central Vermont Transp. Co. v. Durning, 294 U.S. 33, 55 S.Ct. 306, 79 L.Ed. 741 (1935). There, a Maine corporation which operated a steamship line on Long Island Sound was almost entirely owned by a Vermont railroad corporation, which in turn was almost completely owned by a Canadian corporation. Construing section 2 of the Shipping Act and section 27 of the Jones Act, the Court held that the vessels of the steamship line were not owned by U.S. citizens, since the ultimate owner was a Canadian corporation. Id. at 37, 55 S.Ct. at 307-08. We read Central Vermont as requiring us to look beyond the corporate entity actually "operating" the vessel in determining compliance with section 2.
 
 
 61
 In Meacham Corp. v. United States, 207 F.2d 535 (4th Cir.1953), cert. dismissed, 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1954), the Court of Appeals for the Fourth Circuit examined the citizenship of a vessel-owning corporation in which U.S. citizens served as president and vice-president and all of the corporate directors. Although these Americans held a majority of the voting stock,[14] they had initially contributed only six dollars to the corporation, while Chinese businessmen had raised six million dollars. In a detailed analysis of the initial set-up and day-to-day operations of the corporation, the Fourth Circuit held that the citizenship requirements of section 2 were not satisfied, since "the evidence shows that this titular control was given [to the Americans] with the expectation that they would exercise their power in the interests of their Chinese associates and that they acted accordingly." Id. at 543.
 
 
 62
 More recently, the Supreme Court was confronted with a different issue of foreign corporate ownership in K Mart. The case involved the apparent conflict between a Customs Service regulation permitting the importation of certain gray-market goods and a statute protecting "a trademark owned by a citizen of, or by a corporation ... created or organized within, the United States." K Mart, 486 U.S. at 287-88, 108 S.Ct. at 1815-16 (quoting 19 U.S.C. § 1526(a)) (emphasis added). In three separate opinions, all of the justices recognized the ambiguity inherent in the statute's use of the phrase "owned by." See id. at 292, 108 S.Ct. at 1818 (opinion of Kennedy, J.); at 298-99, 108 S.Ct. at 1821 (opinion of Brennan, J.); at 318-19, 108 S.Ct. at 1831-32 (opinion of Scalia, J.). Justice Kennedy's opinion, which was joined by Justice White, noted: "This ambiguity arises from the inability to discern, from the statutory language, which of the two entities ... can be said to 'own' the United States trademark if, as in some instances, the domestic subsidiary is wholly owned by its foreign parent." Id. at 292, 108 S.Ct. at 1818 (opinion of Kennedy, J.).
 
 
 63
 Justice Brennan's opinion, which was joined by three other justices, recognized the pitfalls of a formalistic definition of ownership in the parent-subsidiary context:
 
 
 64
 But they are fragile [statutory] barriers indeed if a foreign manufacturer might bypass them by the simple device of incorporating a shell domestic subsidiary and transferring to it a single asset--the United States trademark. Such a reading ... seems entirely at odds with the protectionist sentiment that inspired the provision.
 
 
 65
 Id. at 298, 108 S.Ct. at 1821 (opinion of Brennan, J.). Thus, according to Justice Brennan, the better definition of "owned by" would recognize that "the parent corporation--not the subsidiary whose every decision it controls--better fits the bill as the true owner of any property that the subsidiary nominally possesses." Id. at 299, 108 S.Ct. at 1821.[15] We agree.
 
 
 66
 Although section 2 uses the term "operating" in contrast to the term "ownership" in the Marad regulation and "owned by" in K Mart, the Supreme Court's probing analysis in Central Vermont and K Mart should guide us in our interpretation of "operating." Under section 2, "[wle are therefore compelled to observe the substance rather than the form of the transaction." Meacham, 207 F.2d at 543. In this case, the corporate relationship between Seagram, Du Pont and Conoco need not undergo much scrutiny, since the chain of corporate ownership is not complicated. For all practical purposes, non-citizens control more than one-fourth of the stock and voting power of Conoco, which is a corporation "operating" vessels in the coastwise trade, and thus the 75 percent citizenship requirement is not satisfied.
 
 
 67
 The sole case cited by Conoco to support its reading of section 2 is Sun Chemical Corp. v. Dainippon Ink & Chemicals, Inc., 635 F.Supp. 1417 (S.D.N.Y.1986). Sun Chemical, an American corporation, sought to enjoin Dainippon, a Japanese corporation, from acquiring more than 25 percent of Sun's stock, because such a stock acquisition might have threatened Sun's partial ownership of a corporation whose subsidiaries operated vessels in the coastwise trade. The court denied the injunction and suggested in dicta that section 2 should be read as only imposing the 75 percent requirement on the corporation operating the vessels and not Sun Chemical. Id. at 1424. However, the court explicitly noted that it was not deciding the citizenship issue: "I note, without deciding the issue, that Dainippon's reading of the 75% provision is more consistent with the language of the statute.... But for present purposes it is unnecessary to decide these issues." Id. We give no weight to the dicta of Sun Chemical.[16]
 
 
 68
 Although the Marad regulation is not inconsistent with the language of section 2, we concede that the language is not "plain and unambiguous,"[17] Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978), since section 2 does not deal explicitly with the citizenship of parent corporations. Thus, we must examine the reasonableness of Marad's interpretation under Chevron. Cf. Air Courier, 959 F.2d at 1224 ("judicial deference to an agency's construction of a statute in conflict with the statute's plain meaning would be inappropriate"). In determining whether that interpretation is "permissible" under Chevron, we turn to the legislative history of section 2. See Velis v. Kardanis, 949 F.2d 78, 81 (3d Cir.1991) ("There is no need to resort to legislative history unless the statutory language is ambiguous."); West v. Bowen, 879 F.2d 1122, 1140 (3d Cir.1989) ("The effort to examine an agency interpretation for harmony with statutory purpose ... has a long history in Supreme Court jurisprudence."). Conoco offers a detailed explication of the legislative history to support its "controlling interest" theory, that is, the subsidiary is required to be 75 percent American owned, but the parent can be merely majority American owned. However, our analysis of the legislative history reveals that Marad's interpretation is more consistent with the intent of Congress.
 
 
 69
 When enacted in 1916, the Shipping Act did not have the current 75 percent requirement but only required a "controlling interest" (i.e., more than 50 percent stake) to be held by U.S. citizens. In 1920, the Jones Act was under consideration by Congress. The House version of the Act did not propose to change the citizenship requirement of section 2. However, the Senate passed a bill which would have required that the stock of a corporation seeking to be a citizen under section 2 be "at all times wholly and bona fide owned by citizens of the United States." S.Rep. No. 573, 66th Cong., 2d Sess. 23-24 (1920). In other words, a corporation had to be 100 percent owned by U.S. citizens in order to satisfy section 2.[18] The Senate bill was accompanied by much patriotic rhetoric:
 
 
 70
 The Commerce Committee takes it for granted that every patriotic citizen now wishes to see a merchant marine under the American flag large enough to carry the major part of our own foreign trade and such part of the world's carrying trade as may be commensurate with our wealth, power, and standing among the nations of the world, and that whatever is necessary to bring that about they want done. We need such a fleet, not only for our commercial growth but for the Nation's defense in time of war and the stability of domestic industry in time of peace.
 
 
 71
 Id. at 1; see also 59 Cong.Rec. 6989 (1920) (remarks of Sen. Edge) (noting "sentimental effect" of 100 percent requirement). Similarly, in a letter to the Senate Commerce Committee, the chairman of the U.S. Shipping Board wrote:
 
 
 72
 Unless our coasting fleet be wholly and unequivocally owned by loyal United States citizens, it can not be rated a dependable unit in time of national emergency. Such dependability must always be insured, and this can only be accomplished by making 100 per cent bona fide American ownership the only key to our coasting trade ...
 
 
 73
 Id. at 10.
 
 
 74
 When the bill reached the conference committee, the 100 percent citizenship requirement for coastwise vessels was lowered to 75 percent, since it was recognized that a 100 percent requirement would be unenforceable. See 59 Cong.Rec. 6989-90 (1920) (remarks of Sen. Edge) ("Many of these [American ship-owning] corporations are listed on the stock exchanges. Any alien can buy stock on the exchanges at any time."). The eventual compromise was explained by the conference report as follows:
 
 
 75
 The shipping act, 1916, in section 2, provides that in order for a corporation, partnership, or association to be considered a citizen of the United States for purposes of this act, a controlling interest therein must be owned by citizens of the United States. The Senate amendment amends this provision so as to require 100 per cent ownership by United States citizens ... The House recedes with an amendment which restores the existing law, but provides for a requirement of 75 per cent ownership in the case of corporations, partnerships, and associations operating any vessel in the coastwise trade.
 
 
 76
 H.Rep. No. 1107, 66th Cong., 2d Sess. 33 (emphasis added). Conoco interprets the phrase "restores the existing law" to mean that the pre-1920 controlling interest test remains the rule for parent corporations.
 
 
 77
 Conoco's interpretation is flawed for several reasons. First, the conference committee did restore the existing controlling interest test with respect to non-coastwise vessels but established a specific 75 percent exception for coastwise vessels. Conoco reads too much into the phrase "restores the existing law" and neglects the subsequent clause which begins with the word "but." For vessels operating in the coastwise trade, the 75 percent exception was clearly intended to trump the controlling interest test;[19] such an interpretation is consistent with the rule that specific statutes generally take precedence over general statutes. See Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987). Second, the lowering of the citizenship requirement from 100 percent to 75 percent was not a complete disavowal of the nationalistic sentiment which initially prompted the Senate to approve the 100 percent requirement. Given the patriotic fervor which surrounded the Senate bill, it would be wrong to infer that the 75 percent requirement was anything more than a grudging compromise by the Senate. Certainly, Congressional intent would be contravened if we were to read the conference committee modification as opening the door to foreign ownership of coastwise vessels.
 
 
 78
 Conoco's analysis of the 75 percent requirement also neglects the broader principles which underlie the entire statutory scheme regulating the American merchant marine. "The relevant question is not whether a result inconsistent with the literal language of the statute is consistent with the legislative history, but rather whether it is compelled by that history." Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 912 (3d Cir.1990) (emphasis in original); see also Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975) (in interpreting a statute, a court " 'must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy' ") (citation omitted). Although it is true that the language of section 2 is ambiguous, the longstanding Congressional policy toward the merchant marine is unmistakably clear. See Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 (courts "must reject administrative constructions which are contrary to the clear congressional intent"). This country's maritime statutes share the dual goals of ensuring a viable merchant marine for national defense purposes and fostering the commercial interests of American shipowners. 46 U.S.C.App. § 861 (1988); see also 46 U.S.C.App. § 1242 (allowing Secretary to requisition or purchase documented vessel in time of emergency). In promulgating rules and regulations, the Secretary of Transportation is required to "keep always in view this purpose and object as the primary end to be attained." 46 U.S.C.App. § 861.
 
 
 79
 Since 1789, the first year of this country's government, Congress has enacted laws "which have imposed restrictions of steadily increasing rigor on the transportation of freight in coastwise traffic by vessels not owned by citizens of the United States."[20] Central Vermont, 294 U.S. at 38 & n. 1, 55 S.Ct. at 308 & n. 1. Prior to 1825, no corporation could own vessels documented under U.S. registry laws. Ingram Barge Co. v. United States, 691 F.Supp. 474, 476 (D.D.C.1988); rev'd on other grounds, 884 F.2d 1400 (D.C.Cir.1989). From 1825 to 1858, corporations owned entirely by U.S. citizens could document vessels. Id. U.S. corporations with foreign stockholders were first allowed to document vessels in 1858. However, "[t]he pendulum swung substantially back towards greater restrictions on foreign influence on coastwise activities in 1920" with the passage of the Jones Act and the restrictions at issue in this case. Id.
 
 
 80
 The principles underlying the Jones Act were examined in great detail by the Court of Appeals for the Second Circuit in Marine Carriers Corp. v. Fowler, 429 F.2d 702 (2d Cir.1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). The court observed that the U.S. merchant marine is treated as a "jealously guarded preserve" and vessels participating in the shipping trade "must be thoroughly American." Id. at 703. Thus, the Jones Act must be construed so as to promote American interests:
 
 
 81
 These provisions are unabashedly protectionist. Their aims are to protect the American shipping industry already engaged in the coastwise trade, to provide work for American shipyards, and to improve and enhance the American Merchant Marine.... To permit ships built in the United States for foreign owners ... to participate in the coastwise trade ... could result in an excessive number of ships engaged in that trade to the prejudice of other American shippers. The depressing of charter rates could be one by-product which Congress sought to avoid.
 
 
 82
 Id. at 708 (citations omitted); see also Wirth Ltd. v. S/S Acadia Forest, 537 F.2d 1272, 1280-81 n. 32 (5th Cir.1976); Meacham, 207 F.2d at 542-43 (both discussing policy of protecting American merchant marine). The only deviation from this longstanding policy of protectionism was the Bowaters Amendment of 1958.
 
 
 83
 The safeguarding of the American shipping fleet continues to this day. Prior to 1988, section 9 of the Shipping Act required approval by the Secretary of Transportation for a transfer of an "interest" in a vessel to a non-citizen. In 1988, this provision was tightened to require approval also for a transfer of "control" of a vessel. P.L. 100-710, 102 Stat. 4750. The amendment was intended to prevent corporations from circumventing section 9 by transferring de facto control of a vessel without transferring an interest in the vessel. The House Report accompanying the legislation stated that the Secretary's review of approval requests should examine "who, in fact, exercises control and not the form of how a transaction is structured." H.Rep. No. 100-918, 100th Cong., 2d Sess. 25, reprinted in 1988 U.S.C.C.A.N. 6104, 6118. Like the two hundred years of legislation which preceded it, the 1988 amendment was motivated by national security concerns: "The objective of this is to ensure that decisions concerning the use and operation of a documented vessel remain in the hands of citizens of the United States with a view toward making those vessels available to the United States for national defense." Id. at 24, reprinted in 1988 U.S.C.C.A.N. at 6117.
 
 
 84
 After examining the legislative history of section 2 and the related statutory provisions, we cannot say that Conoco's view of the citizenship requirement as only applying to the subsidiary corporation is "compelled by that history." Smith, 898 F.2d at 912. If anything, the strong protectionist sentiment which pervades the various maritime statutes compels the opposite conclusion, that is, the 75 percent requirement applies to all corporations in the chain of ownership, including the parent corporation. Thus, we conclude that Marad's interpretation of section 2 is not only "permissible," but indeed it is the best reading of section 2.
 
 
 85
 If Conoco's argument were to prevail, any corporation which was majority owned by U.S. citizens but did not meet the 75 percent requirement could simply circumvent that requirement by creating a wholly-owned subsidiary which held nominal title to the vessels. This citizenship requirement would be so easy to evade that it would be virtually meaningless. Although there is no evidence that Du Pont's corporate takeover of Conoco was motivated by such a desire to evade section 2, the parties' intent is not a relevant consideration in our analysis. In essence, Conoco would have this court inject a subjective element into what should be an objective standard. Certainly, this was not the aim of Congress when it enacted the various maritime statutes. Indeed, the need to prevent non-citizen corporations from circumventing this country's shipping laws was recognized as far back as 1920:
 
 
 86
 Subjects of foreign Governments, and even foreign Governments themselves, now own and operate vessels of the United States in our domestic coasting trades. This is accomplished through the medium of corporations of the United States, the actual ownership of all or a majority of the securities of which are vested in foreign subjects, so that the corporations are in fact but 'dummies,' ostensibly held by American citizens but in reality a 'camouflage' to the foreign ownership.
 
 
 87
 S.Rep. No. 573, 66th Cong., 2d Sess. 7 (1920) (letter from U.S. Shipping Board).
 
 
 88
 The final component of the Chevron test is whether Marad's interpretation of section 2 is consistent with its previous interpretations.[21] After reviewing the agency interpretations which predate the rule challenged here, we find that the July 1991 Marad rule does no more than codify and elucidate an interpretation that dates back to 1939. See App. at 157-58 (declaration of Robert J. Patton, Jr., deputy chief counsel, Marad); cf. App. at 139 (declaration of Thomas L. Willis, acting chief, Vessel Documentation Branch, Coast Guard). Consequently, we cannot say that the Marad regulation " 'flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute.' " Mazza v. Secretary of Dept. of HHS, 903 F.2d 953, 959 (3d Cir.1990) (citation omitted).
 
 
 89
 In sum, we will uphold the Marad regulation, since courts must defer to an agency's reasonable interpretation of a statute which it administers.
 
 B.
 
 90
 The Bowaters Amendment was enacted in 1958 to create an exception for corporations which could not otherwise meet the citizenship requirements of section 2, and thus were unable to own or charter vessels under section 9. Upon the issuance of a certificate of compliance by the Coast Guard, such corporations are allowed to own vessels for the limited purpose of transporting their own proprietary cargo. Conoco argues, however, that the amendment deems a Bowaters corporation to be a U.S. citizen, and thus the corporation must be considered a "constructive" U.S. citizen for all purposes. As a constructive U.S. citizen, Conoco alleges that it is not required to obtain regulatory approval under section 9 for the bareboat chartering of vessels from other corporations for the carriage of non-proprietary cargo for hire. In effect, Conoco attempts to use the Bowaters Amendment to accomplish indirectly what it cannot accomplish directly through section 2, that is, to compete against vessels owned by U.S. citizens in the coastwise trade. We hold that a Bowaters corporation does not have unfettered authority to bareboat charter vessels for the transportation of non-proprietary cargo as a common carrier in the coastwise trade.
 
 
 91
 As amended in 1988, section 9 requires approval by the Secretary of Transportation for any charter or transfer of "any interest in or control of a documented vessel" to a "person not a citizen of the United States." 46 U.S.C.App. § 808(c)(1). Because Conoco contends that it is a constructive U.S. citizen, it is not required to seek regulatory approval for the chartering of vessels from other corporation, since the vessels are not being chartered to a "person not a citizen of the United States." Conoco's argument that it is a constructive section 2 citizen is predicated on the opening language of the amendment:
 
 
 92
 Notwithstanding any other provision of law, a corporation incorporated under the laws of the United States or any State ... thereof, shall be deemed to be a citizen of the United States for the purposes of and within the meaning of that term as used in [Sections 9 and 37 of the Shipping Act ... Section 27 of the Merchant Marine Act] ... and the laws relating to the documentation of vessels.
 
 
 93
 46 U.S.C.App. § 883-1 (emphasis added).
 
 
 94
 In arguing that it is a constructive section 2 citizen, Conoco makes much of the fact that the Bowaters Amendment begins with the phrase, "Notwithstanding any other provision of law." Conoco cites two decisions which suggest that a phrase preceded by "notwithstanding" should override any conflicting provision, see Liberty Maritime Corp. v. United States, 928 F.2d 413, 417 (D.C.Cir.1991); New Jersey Air Nat'l Guard v. FLRA, 677 F.2d 276, 283 (3d Cir.), cert. denied, 459 U.S. 988, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982), and thus the Bowaters Amendment overrides section 2's citizenship requirement of 75 percent citizenship. However, "ordinarily competing sections of a statutory scheme should be construed to give maximum effect to all provisions." Liberty Maritime, 928 F.2d at 418. Consequently, this court has recently interpreted a "notwithstanding" phrase as not taking precedence over other conflicting provisions. See United States v. Gordon, 961 F.2d 426, 431 (3d Cir.1992) (adopting a narrow definition of "notwithstanding" and noting that "[c]ourts should attempt to reconcile two seemingly conflicting statutory provisions whenever possible, instead of allowing one provision effectively to nullify the other provision.").
 
 
 95
 Conoco's reading of the "notwithstanding" phrase would essentially make section 2 meaningless, since a Bowaters corporation would qualify as a U.S. citizen even though it did not meet the 75 percent requirement of section 2. Conoco is correct that Liberty Maritime interpreted expansively the "notwithstanding" phrase contained in another maritime statute, the Merchant Marine Act of 1936 (46 U.S.C.App. § 1275(c)). However, the Court of Appeals for the D.C. Circuit did not blindly construe this phrase. Instead, it looked to the "primary purpose" of the statute, which was to foster the development of the merchant marine. Liberty Maritime, 928 F.2d at 419. Finding that Congressional intent was consistent with an expansive interpretation of "notwithstanding," the court read the phrase to preempt all laws. Id. Thus, courts must discern the meaning of "notwithstanding" from the legislative history, purpose, and structure of the entire statute.[22] In the case before us, there is ample evidence that Congress did not intend the Bowaters Amendment to supersede section 2. Conoco's interpretation would ease restrictions on foreign ownership of vessels operating in the coastwise trade, and thus run counter to the "primary purpose" of this country's maritime statutes. Consequently, we will not read the "notwithstanding" language of the Bowaters Amendment as superseding section 2.
 
 
 96
 Conoco also relies on the phrase "shall be deemed a citizen" in the amendment to support its contention that a Bowaters corporation must be a citizen for all purposes. According to Conoco, even if it does not qualify as a citizen under section 2, it "shall be deemed a citizen" under the Bowaters Amendment, and thus allowed to conduct its operations as a citizen would, including the chartering of vessels for the carriage of non-proprietary cargo. On the contrary, it has been held that whether the term "shall" is construed as directory or mandatory is also dependent on an examination of Congressional intent, "including whether a mandatory construction would yield harsh or absurd results." Bartholomew v. United States, 740 F.2d 526, 531 (7th Cir.1984); see also United Hosp. Center, Inc. v. Richardson, 757 F.2d 1445, 1453 (4th Cir.1985). As will be discussed below, the Bowaters Amendment was never intended to allow corporations which could not meet the section 2 citizenship requirement to operate as a common carrier engaged in the coastwise trade.
 
 
 97
 A better interpretation of "shall be deemed a citizen" is contained in the preamble to the Marad interim final rule:
 
 
 98
 In MARAD's view, the first sentence of section 883-1 reads as it does because, in order to accomplish that section's purpose, it was necessary to 'deem' qualifying corporations to be citizens for purposes of section 883 (the 'Jones Act'). Having [done] that, it was necessary to deem such corporations to be citizens for purposes of section 9, (a) to ensure that any transfer of a vessel by such a corporation to 'a person not a citizen of the United States' would be subject to approval of the Secretary and (b) to allow such corporations to purchase additional vessels for proprietary use without the redundancy of requiring administrative approval of a use already authorized by statute.
 
 
 99
 56 Fed.Reg. at 30,659 (1991). If the "shall be deemed a citizen" language were not present in the amendment, a Bowaters corporation that operated a vessel in the coastwise trade without prior approval would be in violation of section 9 which prohibits vessel transfers to "a person not a citizen of the United States." 46 U.S.C. § 808(c)(1). Thus, we believe Marad has reasonably characterized a Bowaters corporation as "a Noncitizen corporation," 56 Fed.Reg. 30,665 (1991) (to be codified at 46 C.F.R. § 221.3(a)).
 
 
 100
 Other statutory language explicitly precludes Conoco's reading of the Bowaters Amendment as superseding section 2's definition of citizenship: "When used in this act, unless the context otherwise requires, the term[ ] ... 'citizen of the United States' shall have the meaning assigned ... by section[ ] 802 ... of this title ..." 46 U.S.C.App. § 888. Thus, the citizenship requirements of section 2, which are codified at 46 U.S.C.App. § 802, must be seen as controlling, with the Bowaters Amendment not an absolute grant of section 9 privileges but merely a narrow exception.
 
 
 101
 The language of the amendment itself dictates against a Bowaters corporation chartering vessels for the carriage of non-proprietary cargo, and in effect competing in the shipping industry. The Bowaters Amendment states that "no vessel owned by any such corporation shall engage ... in the transportation of merchandise or passengers for hire between points in the United States." 46 U.S.C.App. § 883-1 (emphasis added). Conoco reads this prohibition as only applying to vessels which are owned by a Bowaters corporation, not to vessels which are chartered. Thus, Conoco concludes that it can bareboat charter vessels for the for-hire carriage of non-proprietary goods as long as it does not hold nominal title to the vessel. This interpretation is flawed.
 
 
 102
 The fact that a Bowaters corporation must be "engaged primarily in a manufacturing or mineral industry," id., indicates that Congress did not intend for such a corporation to be primarily engaged in the shipping industry. Moreover, the aggregate book value of the vessels owned by the Bowaters corporation cannot exceed 10 percent of the total aggregate book value of the corporation's assets. Id. This would be a modest percentage for a common carrier. The amendment also provides for only two exceptions to the general prohibition against the carriage of non-proprietary cargo: 1) "as a service for a parent or subsidiary corporation"; and 2) "when such vessel is under demise or bareboat charter at prevailing rates for use otherwise than in the domestic noncontiguous trades from [a Bowaters] corporation to a common or contract carrier ... which otherwise qualifies as a citizen" under section 2 and is not connected with the Bowaters corporation. Id. (emphasis added).
 
 
 103
 Conoco's proposed use of chartered vessels for the carriage of non-proprietary cargo fits under neither of the two exceptions in the amendment. Conoco would imply a third exception, namely, for vessels bareboat chartered from other corporations. We refuse to find that a third exception exists because of the doctrine of expressio unius est exclusio alterius. As the Supreme Court has explained: "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980). Conoco has not convinced us that Congress intended to allow a Bowaters corporation to use chartered vessels for for-hire transportation, even though it did not allow the corporation to use vessels which it owned for the same purpose. The fact that bareboat charters are so similar to ownership--a bareboat charterer obtains full possession and control of the vessel--weighs against Conoco's interpretation. See Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096-97, 8 L.Ed.2d 205 (1962) (a bareboat charter is "tantamount to, though just short of, an outright transfer of ownership"); cf. Reed v. Steamship Yaka, 373 U.S. 410, 412-13, 83 S.Ct. 1349, 1351-52, 10 L.Ed.2d 448 (1963) (bareboat charterer is liable for chartered vessel's unseaworthiness).
 
 
 104
 Conoco's overall construction of the amendment is also contrary to the legislative history, which evinces Congress' intention that the amendment not allow Bowaters corporations to circumvent the requirements of sections 2 and 9. The amendment was intended to be at most a "minor exception[ ] to the general rule" governing vessels engaged in the coastwise trade. S.Rep. No. 2145, 85th Cong., 2d Sess. at 2, 1958 U.S.C.C.A.N. at 5190. In January 1958, three bills were introduced in the House which would have created an exception for vessels "owned by [a qualifying] corporation organized under the laws of the United States or chartered by such corporation." H.R. 9826, 9855, 10202, 85th Cong., 2d Sess. (1958) (emphasis added). Thus, under these bills, a qualifying corporation would have been authorized to operate owned or chartered vessels in the coastwise trade.
 
 
 105
 However, the bill which was eventually reported by the House Committee on Merchant Marine and Fisheries omitted any reference to vessels chartered by these corporations. H.R. 9833, 85th Cong., 2d Sess. (1958). Both the House and Senate passed the bill without any changes, and it is now codified at 46 U.S.C.App. § 883-1 as the Bowaters Amendment. Given the omission of chartered vessels from the final bill, it is clear that Congress considered and rejected giving statutory permission for a Bowaters corporations to operate chartered vessels in the coastwise trade without section 9 approval. The amendment as ultimately enacted only allows the operation of vessels owned by these corporations.
 
 
 106
 Additional legislative history indicates that the prohibition on Bowaters corporations operating as common carriers was not intended to be restricted to owned vessels. The Senate Report which accompanied the bill noted:
 
 
 107
 Your committee was concerned about amending the Merchant Marine Act of 1920 and disturbing the principle contained therein.... The opponents of this bill maintain it would 'open the door' to further violations of the principle involved. In arriving at its favorable decision, your committee has carefully studied the restrictive provisions of the legislation, taking special note of the fact that such corporations would be restricted to the carriage of their own goods, could not engage as a common carrier, and to the utilization of self-propelled vessels of 500 gross tons or less.
 
 
 108
 S.Rep. No. 2145 at 3-4, 1958 U.S.C.C.A.N. at 5192-5193 (emphasis added). This prohibition against operating as a common carrier also appears to apply to vessels chartered by a Bowaters corporation.[23]
 
 
 109
 More significant is the House Report's language that "the corporation would be forbidden under any circumstances from engaging in transportation as a common carrier" in order to prevent competition with U.S. citizens. H.Rep. No. 2270, 85th Cong., 2d Sess. 5 (1958) (emphasis added); see also 104 Cong.Rec. 17,736 (1958) (statement of Sen. Pastore); 104 Cong.Rec. 15,481-82 (1958) (statements of Reps. Rivers and Hemphill). The House floor debates demonstrate Congress' intent that a Bowaters corporation's "[v]essel operations ... would be purely incidental to the company's principal function." Id. at 15,481 (1958) (statement of Rep. Rivers) (emphasis added). Thus, we find no merit to Conoco's suggestion that the restrictions on the carriage of non-proprietary cargo for hire should not apply to vessels chartered by Bowaters corporations.
 
 
 110
 Finally, Conoco questions the consistency of Marad's interpretation with regard to the Bowaters Amendment. The government concedes that the Secretary has changed positions on whether a Bowaters corporation may charter in vessels for the carriage of its own proprietary cargo. However, since 1975, Marad has had a policy against approving bareboat charters to Bowaters corporations for the purpose of transporting non-proprietary cargo in the coastwise trade as a common carrier. 55 Fed.Reg. 14,046 (1990) (citing 40 Fed.Reg. 28,832 (1975)); see also 56 Fed.Reg. 30,659 (1991) ("longstanding" policy against such charters); Hearings on H.R. 9833 Before the Subcomm. on Merchant Marine of the Comm. on Merchant Marine and Fisheries, 85th Cong., 2d Sess. 48-49 (1958) (in 1958, Marad did not allow bareboating of vessels to noncitizens for coastwise trade). The reason for this policy was explained by Marad as follows:
 
 
 111
 Reservation of this nation's cabotage trade to vessels built in the United States and owned and operated by United States citizens is a principle almost as old as this nation itself. Absent specific legislative relief for particular vessels or in extraordinary circumstances, that policy principle has been uniformly adhered to. The fact that a demise or bareboat charter of a vessel to a noncitizen would carry with it many of the indicia of ownership such as possession, operational control and the direct benefits of its employment in domestic commerce, renders the rationale for not approving such charters to noncitizens for use in the coastwise trade readily apparent.
 
 
 112
 55 Fed.Reg. 14,046 (1990) (emphasis added).
 
 
 113
 Conoco offers several examples of what it contends are earlier inconsistent positions taken by Marad, the Coast Guard, and the Customs Service. On the contrary, the documents to which Conoco refers us--certificates issued to signify compliance with the requirements of the Bowaters Amendment--merely authorize corporations "to operate vessels in the coastwise trade, as owner, or charterer, subject to the limitations of the Act." App. at 558-60 (emphasis added). Conoco reads the phrase "or charterer" as indicating that Bowaters corporations have been allowed to charter vessels in the past without regulatory approval. However, when read in conjunction with the clause "subject to the limitations of the Act," the phrase "or charterer" must be referring to either time charters or one of the exceptions in the amendment (service for parent or subsidiary, or charters to section 2 citizens for non-domestic use). Indeed, a 1964 Customs Service letter authorized a non-citizen corporation to "operat[e] vessels under charter in the coastwise trade for the carriage of its own cargoes or those of a parent or subsidiary corporation." App. at 556 (emphasis added). The other example cited by Conoco, a 1978 letter from Marad's deputy general counsel, merely indicates that time charters by Bowaters corporations have been allowed without Marad approval. The record is devoid of support for Conoco's position that unfettered authority has been given for bareboat charters to such corporations for the carriage of non-proprietary cargo. Thus, we find no inconsistency between Marad's position in this case and positions it or any other agency has taken in the past.
 
 
 114
 When the language of the Bowaters Amendment is juxtaposed against the entire statutory scheme governing the merchant marine, it is obvious that Conoco's interpretation cannot prevail. Accordingly, we find that Marad has permissibly interpreted the Bowaters Amendment to preclude the bareboat chartering of coastwise vessels to Bowaters corporations without prior regulatory approval.
 
 C.
 
 115
 As an alternative to Chevron deference, Conoco argues that the maritime statutes, if they are found to be ambiguous, should be strictly construed, since violators of the statutes are subject to criminal penalties, including fines, imprisonment and vessel forfeiture. See, e.g., 46 U.S.C.App. § 808(d)(2) (fine and imprisonment for knowing violation of section 9); § 808(d)(3)(B) (forfeiture of vessel for violation of section 9); § 808(d)(4) (civil penalty for violation of section 9); § 839 (fine and imprisonment for making knowingly false statement of fact in obtaining section 9 approval); § 883 (forfeiture of merchandise for violation of Jones Act); § 883-1 (forfeiture of vessel for false statements of fact in obtaining Bowaters status, and forfeiture of merchandise for transporting cargo for hire). Conoco maintains that the ambiguity in the maritime statutes does not give a clear and unequivocal warning of the harsh penalty which Conoco potentially faces.
 
 
 116
 As support for its position, Conoco cites American Maritime Ass'n v. Blumenthal, 590 F.2d 1156 (D.C.Cir.1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979). In that case, the D.C. Circuit held that the Jones Act must be construed strictly since it imposes forfeiture of cargo for violations. Id. at 1165. Although the court recognized that statutes of a regulatory nature are usually construed broadly, it concluded that the Jones Act was more similar to a penal statute than a statute regulating commerce. Id. at 1166. Consequently, "[d]ecisions construing regulatory statutes broadly, from their very nature and purpose, are of doubtful applicability." Id.
 
 
 117
 The government responds that in rem forfeiture is intended to promote compliance with the coastwise laws and not to punish wrongdoers. Thus, the statutes are better characterized as regulatory, rather than penal, and should be construed broadly. The government cites United States v. One Assortment of 89 Firearms, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), in which the Supreme Court held that the firearm forfeiture provision in 18 U.S.C. § 924(d) is a remedial civil sanction instead of a criminal punishment. Id. at 364, 104 S.Ct. at 1105-06. " 'Only the clearest proof ' that the purpose and effect of the forfeiture are punitive will suffice to override Congress' manifest preference for a civil sanction." Id. at 365, 104 S.Ct. at 1106 (citation omitted) (emphasis added).
 
 
 118
 We believe the government has the better argument. Although vessel or cargo forfeiture is indeed a "horrendous penalty," American Maritime Ass'n, 590 F.2d at 1165, the harshness of the penalty itself does not make a statute penal in nature. The Supreme Court has set forth a list of factors to determine whether a statute is penal or regulatory. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644 (1963). We need not look to these factors, however, since Conoco has not established by "the clearest proof" that Congress intended the forfeiture provisions to be a criminal penalty. Even if these provisions could be considered penal, we will not create ambiguity when Congress has clearly conveyed the purpose of the statutes. See United States v. Culbert, 435 U.S. 371, 379, 98 S.Ct. 1112, 1116-17, 55 L.Ed.2d 349 (1978). The fact that imprisonment is generally authorized only for knowing violations of the law, see 46 U.S.C.App. §§ 808(d)(2), 839, also weighs against a narrow construction of the maritime statutes.
 
 
 119
 A plurality of the Court recently stated that "lenity does not always require the 'narrowest' construction, and our cases have recognized that a broader construction may be permissible on the basis of nontextual factors that make clear the legislative intent where it is within the fair meaning of the statutory language." United States v. R.L.C., --- U.S. ----, ----- n. 6, 112 S.Ct. 1329, 1338 n. 6, 117 L.Ed.2d 559 (1992); see United States v. Thompson/Center Arms Co., --- U.S. ----, ----, 112 S.Ct. 2102, ---- - ----, 119 L.Ed.2d 308 (1992) (attempting to resolve ambiguity in criminal statute by looking at legislative history before application of rule of lenity). As we have already discussed in great detail, Congress intended to do whatever was necessary to protect and foster the American merchant fleet. See Meacham, 207 F.2d at 548 (clear declaration of section 9's purpose is a sufficiently specific definition of standards). There is no reasonable doubt as to the intended scope or purpose of these statutes, see Moskal v. United States, --- U.S. ----, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990), and thus we see no reason to construe them narrowly.
 
 IV.
 
 120
 Finally, Conoco appeals the district court's dismissal of its claim against the Customs Service. According to the district court, the plaintiffs named the Customs Service as a defendant solely as a means to circumvent the Hobbs Act, since Conoco alleged that the Customs Service was not under the control of the Secretary of Transportation as provided in 28 U.S.C. § 2342. The district court held that "plaintiff has not demonstrated that the Customs Service is essential to proper determination of the issues or that it would not be bound by the determination of the issues involved." Conoco, 781 F.Supp. at 314.
 
 
 121
 Conoco reasons that the Customs Service was a proper defendant, since the Customs Service enforces and monitors a vessel's compliance with the coastwise laws. However, the Customs Service does not regulate preliminary matters of citizenship, transfer, or documentation of vessels, which are the focus of Conoco's complaint. These preliminary matters are regulated by Marad and the Coast Guard. A declaration of a Customs Service official explains:
 
 
 122
 In making decisions on whether a particular movement of merchandise constitutes a coastwise violation, the Customs Service relies on and does not question documentation decisions made by the Coast Guard. For the purpose of vessel documentation, questions regarding citizenship are in the domain of the Coast Guard. In instances where the Customs Service has reason to doubt the authenticity or accuracy of the documentation, the question is referred to the Coast Guard.... The Customs Service defers to Marad's interpretation of Section 9 of the Shipping Act of 1916.
 
 
 123
 App. at 185 (declaration of B. James Fritz, Chief, Carrier Rulings Branch, U.S. Customs Service). Thus, Conoco has no judicially cognizable claim against the Customs Service, see Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), and we will affirm the district court's order dismissing the Customs Service as a defendant in this action.
 
 V.
 
 124
 We are not unmindful of the additional costs which will be incurred by both Conoco and Du Pont as a result of this new regulation. However, our discussion of American maritime policy leads inexorably to the conclusion that Congress intended to protect and foster the American merchant marine at any cost. Whether this policy is a sound one is for Congress, not the courts, to decide. Accordingly, we will affirm the district court's dismissal for lack of jurisdiction at no. 91-3920, and deny the petition for review at no. 91-3589 and uphold the regulation of the Maritime Administration.
 
 SUR PETITION FOR REHEARING
 
 125
 Aug. 18, 1992.
 
 
 126
 Before: SLOVITER, Chief Judge; BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and GARTH*, Circuit Judges.
 
 
 127
 The petition for rehearing filed by petitioners/appellants having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 
 [1]
 The coastwise trade is defined as "the transportation of passengers or merchandise between points in the United States embraced within the coastwise laws." 46 C.F.R. § 67.01-1 (1991); see also 46 U.S.C.App. § 877 (1988) (extending coastwise laws to island territories and possessions)
 
 
 [2]
 Vessel documentation is a type of national registration which is evidence of a vessel's nationality and its qualification to be employed in a specified trade. 46 U.S.C.A. § 12104 (West Supp.1992); see also 46 U.S.C.App. § 801 (1988) ("The term 'documented under the laws of the United States,' means 'registered, enrolled, or licensed under the laws of the United States.' "); Meredith L. Hathorn, Comment: The Vessel Documentation Act of 1980, 7 Mar.Law. 303 (1982). The provisions governing the documentation of vessels are set forth in 46 U.S.C.A. §§ 12101-22 (West Supp.1992)
 
 
 [3]
 A "bareboat" or "demise" charter is defined as:
 the transfer of full possession and control of the vessel for the period covered by the contract. The charterer obtains the right to run the vessel and carry whatever cargo he chooses. The ship is manned and supplied by the charterer as well. The legal test of a demise is whether the owner of the vessel 'completely and exclusively relinquished possession, command and navigation to the demisee.' ... For most purposes, the charterer in a demise is treated as an owner, termed pro hac vice.
 Thomas J. Schoenbaum, Admiralty and Maritime Law 382 (1987). A bareboat charter is distinguished from a time charter, which involves a contract to use a vessel for a limited period of time. Id. The time charterer can direct the vessel's movements during the chartering period, although the vessel owner retains possession and control. Id.
 
 
 [4]
 The Customs Service is an agency within the Treasury Department. 19 U.S.C. § 2071 (Supp. I 1990)
 
 
 [5]
 Du Pont holds a certificate signifying compliance with the provisions of the Bowaters Amendment. Conoco has satisfied the requirements of the amendment but has not applied for such a certificate
 
 
 [6]
 After this case was briefed and argued, Marad promulgated a "final rule" in June 1992. See 57 Fed.Reg. 23,470-88 (1992). We have decided this case on the basis of the July 1991 "interim final rule," although we note that there is no substantial difference between the two rules
 
 
 [7]
 For the sake of clarity, we will hereinafter refer to petitioners-appellants as Conoco
 
 
 [8]
 Conoco concedes that the 60 day period for appellate review of the Coast Guard regulation has expired. See 28 U.S.C. § 2344 (1988)
 
 
 [9]
 The Administrative Procedures Act authorizes judicial review in the district courts if no statutory provision for review in the court of appeals is applicable. 5 U.S.C. § 703 (1988)
 
 
 [10]
 As long as this court has jurisdiction over one of the challenged regulations, the interests of judicial economy and efficiency allow us to hear the entire matter. "In the absence of specific evidence of contrary congressional intent ... we have held that review of orders resolving issues preliminary or ancillary to the core issue in a proceeding should be reviewed in the same forum as the final order resolving the core issue." Florida Power, 470 U.S. at 743, 105 S.Ct. at 1606; see also Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 192 (7th Cir.) ("When an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court."), cert. denied, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986)
 
 
 [11]
 The statutory definition of "agency" includes the Federal Communications Commission, the Federal Maritime Commission, the Interstate Commerce Commission, the Atomic Energy Commission, the Department of Agriculture, and the Maritime Administration. 28 U.S.C. § 2341(3). Other provisions of the Hobbs Act do use the term "agency." See 28 U.S.C. §§ 2344, 2346-48
 
 
 [12]
 The Marad rule was promulgated following a 1988 revision of section 9. When the proposed revision was before the House Merchant Marine and Fisheries Committee, the Committee expressed its intent that the Secretary "prescribe guidelines [as to transfer of control] so there will be a uniform application of policy and to advise the public as to the types of transfer for which the Secretary has concern." H.Rep. No. 100-918, 100th Cong., 2d Sess. 25 (1988), reprinted in 1988 U.S.C.C.A.N. 6104, 6118
 
 
 [13]
 Because the plain language of the Hobbs Act vests this court with exclusive jurisdiction over the Marad rule, we need not examine Conoco's claim that Marad lacked rulemaking authority when the Hobbs Act was originally enacted
 
 
 [14]
 Meacham involved the "controlling interest" requirement of section 2 since the corporation's vessels were not being used in the coastwise trade
 
 
 [15]
 Although Justice Scalia dissented from the majority's upholding of two sections of the regulation, he noted: "It may be reasonable for some purposes to say that a trademark nominally owned by a domestic subsidiary is 'owned by' its foreign parent corporation." K Mart, 486 U.S. at 318, 108 S.Ct. at 1831 (opinion of Scalia, J.)
 
 
 [16]
 We also give no weight to Marad's decision not to express a position on the 75 percent requirement in Sun Chemical. 635 F.Supp. at 1423 n. 1. & 1424
 
 
 [17]
 That the applicability of section 2 is less than obvious should not be surprising given the state of this country's maritime laws. "[The maritime laws] are a confusing collection of individual statutes enacted over a period of nearly two centuries--each enacted to solve some particular problem of the day. Viewed now, as a whole, they are poorly organized, duplicative, often obsolete, and difficult to understand and apply." H.Rep. No. 100-918, 100th Cong., 2d Sess. 11, reprinted in 1988 U.S.C.C.A.N. 6104, 6104
 
 
 [18]
 The Senate bill provided that corporations operating vessels exclusively in foreign commerce need only be 75 percent U.S. citizen owned. S.Rep. No. 573 at 24 (App. at 409)
 
 
 [19]
 Even Senator Edge, who spoke out against the 100 percent requirement on the Senate floor, recognized that the existing controlling interest test would be revised: "The Senate may not consider 'a majority' of American ownership sufficient, but, on the other hand, 100 per cent American ownership in a corporation is absolutely impossible of enforcement." 59 Cong.Rec. 6990 (1920)
 
 
 [20]
 See, e.g., Act of July 4, 1789, ch. 2, § 5, 1 Stat. 24, 27 (discount on duties for goods imported in vessels owned by U.S. citizens); Act of July 20, 1789, ch. 3, 1 Stat. 27 (tax on foreign vessels transporting U.S. products coastwise); Act of March 1, 1817, ch. 31, § 4, 3 Stat. 351 (prohibition on foreign vessels in domestic trade) (all cited in American Maritime Ass'n v. Blumenthal, 590 F.2d 1156, 1158 n. 11 (D.C.Cir.1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979)); see also Comment: The Vessel Documentation Act of 1980, supra, at 303-05
 
 
 [21]
 We note that Chevron does not require the agency to be absolutely consistent in its interpretations:
 The fact that the agency has from time to time changed its interpretation ... does not ... lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.
 467 U.S. at 863-64, 104 S.Ct. at 2792.
 
 
 [22]
 We recognize that the language in N.J. Air Nat'l Guard, 677 F.2d at 283, is difficult to reconcile with our conclusion in the case currently before this court. Yet even in N.J. Air Nat'l Guard, we looked to Congressional intent in determining the scope of a "notwithstanding" phrase: "the preemptive language [of 'notwithstanding'] is powerful evidence that Congress did not intend any other, more general, legislation, whenever enacted" to take precedence. Id
 
 
 [23]
 The limited scope of the proposed amendment was evident during the House committee hearings. In response to a question from Representative Thompson, a Bowaters executive stated that his company would only "transport in our own barges our own products and our own raw materials and we specifically do not want to become a common carrier or a contract carrier." Domestic Shipping Problems: Hearings on H.R. 9833, H.R. 5490, and H.R. 12125 Before the Subcomm. on Merchant Marine of the Comm. on Merchant Marine and Fisheries, 85th Cong., 2d Sess. at 29 (1958) (App. at 455). A Shell executive stated that his company was interested in the shipping business only "as an incident" to its primary business. Id. at 47 (App. at 464). "We are not in the least interested in engaging in shipping for hire in competition with United States shipping interests." Id
 
 
 *
 As to panel rehearing